UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**04  10276 RWZ** p o 22

|  |  |  |
|---|---|---|
| NADIA JEAN MICHEL, | ) | |
| Petitioner | ) | Civil Action |
| | ) | No. |
| v. | ) | |
| | ) | |
| BARBARA GUARINO, | ) | |
| Respondent. | ) | |
| | ) | |

### PETITIONER'S INITIAL MEMORANDUM IN SUPPORT OF
### HER PETITION FOR WRIT OF HABEAS CORPUS

In initial support of her petition, Nadia Jean Michel says as follows:

**1. Procedural And Factual Background.**

A grand jury sitting in Plymouth County returned eleven indictments containing forty-seven counts against the petitioner Nadia Jean-Michel on December 22, 1997. Two other individuals, Enid Rosario and Malenkow-Jean Michel were also indicted.

The petitioner filed a pretrial motion to dismiss which was denied by Judge King on August 28, 1998. The petitioner was put to trial with her co-defendant Enid Rosario on the counts they had in common before the Honorable Judge Cowin and a jury on July 12, 1999. On July 13, 1999, Judge Cowin mistried the case.

The petitioner was next put to trial before the Honorable Judge Patrick Brady and a jury on June 5, 2000. The Commonwealth moved for trial on twenty-seven of the pending counts, including charges of insurance fraud (indictment numbered 100225, count 2); motor vehicle fraud insurance fraud (indictment numbered 100226, counts 1, 2, 5, 6, 7, 8, 9, and 16); workers compensation fraud (indictment numbered 100227); larceny over (indictment numbered 100228,

1

counts 1, 2, 5, 6, 8, 9, 14, and 15)[1]; attempted larceny over (indictment numbered 100229, counts 1, 2, and 3); perjury (indictment numbered 100230); welfare fraud (indictment numbered 100231); falsification of operator's license (indictment numbered 100232, counts 1 and 2); and failure to file tax returns (indictment numbered 100233, counts 1 and 2).

After the Commonwealth rested, the petitioner moved for required findings of not guilty, *see* Tr. VI:82, and the trial court directed out count 8 of indictment numbered 100226, count 3 of indictment numbered 100229, and count 2 of indictment numbered 100232, *see* Tr. VI:102-03. The defense rested without calling any witnesses. After the jury charge, the trial court revoked the petitioner's bail on the Commonwealth's motion. The jury deliberated for less than an hour and was sent home for the day. After two further hours of deliberation, the jury returned guilty verdicts as to all submitted counts on June 13, 2000. The petitioner moved for an evaluation in aid of sentencing under G.L. c. 123, §15(e), but that motion was denied.

The petitioner was sentenced to serve, in the aggregate, not less than six years and not more than ten years.[2] *See* Tr. VII:37. She received a lead sentence of not less than three years and not more than five years on count 15 of indictment numbered 100228 (larceny from the Commonwealth).[3] She received an on and after sentence of not less than three years and not

---

[1]Count 15 charged larceny from the Commonwealth, and the other counts charged larcenies from insurance companies.

[2]This sentence exceeded the Commonwealth's recommendation.

[3]On the other larceny counts, she received the same sentence to be served concurrent with each other and concurrent with the lead sentence. On the insurance fraud counts, she received two years at the House concurrent with each other and concurrent with the lead sentence. She received identical House sentences on the attempted larcenies and worker's compensation fraud.

2

more than five years on indictment numbered 100230 (perjury).[4]

On June 21, 2000, a restitution hearing was held. The trial court then issued a restitution order. *See* Tr. 6/21/00:12. The Commonwealth announced it was willing to file the remaining charges without a change of plea, and with the petitioner's consent, the trial court ordered said charges filed. *See* Tr. 6/21/00:9, 12-13.

The petitioner timely perfected her appeal to the Appeals Court. On January 15, 2003 the Appeals Court affirmed her convictions and issued a Memorandum And Order Pursuant To Rule 1:28. Thereafter the Supreme Judicial Court denied further appellate review.

It was the Commonwealth's theory that the petitioner filed over a dozen insurance claims using three different names, various social security numbers and dates of birth, while at the same time collecting welfare benefits under a fourth name, and thus defrauding the Commonwealth and insurance companies of over one hundred thousand dollars. *See* Tr. II:54 (Opening Statement). The defense theory is more difficult to discern. In closing, defense counsel told the jury:

> "Cases get tried for many reasons, many reasons. Sometimes it's because the issues are guilt or innocence. Sometimes there are other considerations."

Tr. VI:149.

Given the issues raised in this petition, the evidence supporting the Commonwealth's wide ranging charges is omitted with the exception of the evidence concerning the fire insurance claim, which is recounted in detail.

Mark Healy testified that he was a senior property claim representative for Aetna in 1994.

---

[4]On the remaining four counts (tax returns, false operator's license, and welfare fraud), she received one year at the House concurrent with the perjury sentence.

3

Tr. IV:130. He said that in assessing claims for lost income or wage, it was important to obtain accurate information from claimants. Tr. IV:132. He handled a claim for a fire loss at a beauty salon that occurred on March 22, 1994. Tr. IV:133. The claimant was Nadia Jean-Michel. Tr. IV:133. He identified the petitioner as the claimant.

He met the petitioner and looked at the fire damage. Tr. IV:136. He ultimately denied the claim. Tr. IV:136. He hired Attorney William Kennedy to conduct an examination under oath of the claimant. Tr. IV:132. He attended it. Tr. IV:137.

The claimant filed suit against Aetna and won it. Tr. IV:141. Nadia Jean-Michel received twenty-two thousand dollars and signed a release. Tr. IV:142-43.

William Kennedy testified that he was an attorney in Quincy. Tr. V:24. In 1994, he was involved in a case involving the Impeccable Beauty Salon and was representing Aetna. Tr. V:29. He examined the petitioner under oath on June 22, 1994. Tr. V:30,32. Her claim was for lost income and property. Tr. V:33. During the examination, the petitioner claimed she had no other work, employment, or income since August of 1993. Tr. V:35. She provided a record showing her monthly income and expenses. Tr. V:38. She provided a copy of her 1993 tax return. Tr. V:39.

Her attorney sent a letter claiming that Aetna's refusal to pay her property loss and her loss of business income had injured her. Tr. V:46. At a later point, she filed a lawsuit. Tr. V:49. Attorney Freeley from his office took her deposition. Tr. V:49. At some point, there was a compromise settlement. Tr. V:49. He said he was unclear whether the claim in the district court went beyond lost property. Tr. V:50.

Austin Freeley testified that at the time in question, he was an attorney working at William Kennedy's law office. Tr. V:57. He represented Aetna in connection with the fire case.

4

Tr. V:58. He deposed the claimant, Nadia Jean-Michel; he identified the petitioner as the person he deposed. Tr. V:58-59. He wanted background information, the circumstances of the loss itself, and other claims information; he thought those things important because they might indicate a pattern of conduct and the claimant's truthfulness. Tr. V:61.

He asked about licensing because his own investigation indicated that the claimant and her employees were not licensed, although she had told Aetna that they were. Tr. V:61-62. He said the insurance company would not issue insurance to an unlicenced establishment. Tr. V:62. At the deposition, she said they were licensed. Tr. V:63. He said the claim involved property damage and lost wages. Tr. V:64. He said that employment was relevant to the issue of financial distress and to mitigation of damages. Tr. V:65. He said that her application for insurance was important for the company in order to assess the risk of loss and that dishonesty in the application could be the basis for denying a claim.[5] Tr. V:66.

Peter Theos testified that his father's name was George Theos. Tr. IV:83-84. He said his father never worked at the Impeccable Beauty Salon in Brockton. Tr. IV:85. He said his father did lease a store in Brockton to Nadia Jean-Michel. Tr. IV:87.

## 2. Legal Issues.

**A. The Perjury Charge**: The perjury indictment alleged specific false statements[6] by the petitioner during her deposition in the civil case of Nadia Jean-Michel, d/b/a Impeccable Unisex

---

[5]A portion of her deposition was read to the jury. *See* Tr. VI:26-82.

[6]Those alleged statements were (1) the petitioner's date of birth and social security number; (2) the extent she earned income after the fire; (3) whether the employees of the hair salon were licensed; and, (4) how many prior and subsequent insurance claims she filed.

*Beauty Salon v. Aetna Insurance Company.* To secure a conviction for perjury, the Commonwealth bore the burden of proving that an alleged false statement was material to an issue or point in question. *See Commonwealth v. Kelley,* 33 Mass. App. Ct. 934, 934-35 (1992). Apparently, the Commonwealth believed that any issue or point in question at the *deposition* was the equivalent of any issue or point in question in the civil lawsuit, and did not bother to introduce the complaint or answer in the civil suit.[7] The evidence the Commonwealth did introduce about the civil suit was extremely thin. There was evidence that the original insurance claim included loss of business income as well as lost business and personal property. *See, e.g.,* Tr. V:33,46,64. But Aetna's lawyers, called as witnesses by the prosecution, either could not recall whether the civil suit involved more than the "business personal property," *see* Tr. V:50,53, or were not asked about what was alleged in the civil suit, *see* Tr. V:56-69. Aetna's claim representative at the time, Mark Healy, said he *imagined* the suit was "referred to as a breach of contract for failing to pay her claim;" but, on cross-examination, he said the suit was over the property damage claim for the property burned in the fire. *See* Tr. IV:141,147. After the civil suit was tried in the district court, there was a judgment for the plaintiff. *See* Tr. IV:147; V:52-53.

Given this evidentiary foundation, there was no basis for a reasonable juror to conclude that any of the false answers alleged were material to the issues in the civil lawsuit (had a reasonable and natural tendency to influence the pertinent determination). *See Commonwealth v. D'Amour,* 428 Mass. 725 n.21 (1999). Similarly, there was no legitimate basis for the Appeals Court to conclude that there was sufficient basis for such a conclusion. The petitioner's motion

---

[7]In the closing argument, the Commonwealth focused on the importance of honest answers at the deposition to the insurance company. *See* Tr. VI:169-72.

6

for required finding made at the end of the Commonwealth's case should have been allowed as to this indictment. It was constitutional error to deny that motion as to this charge. *See Jackson v. Virginia,* 443 U.S. 307 (1979).

**B. The Closing Argument**: After the verdicts w ere r eturned, defense counsel made it clear to the court that he thought his client was crazy for going to trial and should have accepted a plea bargain for a one year commitment offered by two Superior Court judges during the pendency of the case. *See* Tr. VII:12-16. However accurate this perception, a petitioner has a constitutional right not to plead guilty, and his counsel must support that decision. *See Wiley v. Sowders,* 647 F.2d 642, 650-51 (6th Cir.), *cert. denied,* 454 U.S. 1091 (1981). "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic,* 466 U.S. 648, 656-57 (1984).

The petitioner's closing argument is a critical stage of the criminal proceedings. *See Herring v. New York,* 422 U.S. 853 (1975). Denial of the opportunity to make a closing argument amounts to the denial of the right to make a defense, and such denial never can be deemed harmless error. *Commonwealth v. Miranda,* 22 Mass. App. Ct. 10, 22-23 (1986).

It is the petitioner's position that a closing argument that concedes guilt (without the petitioner's p ermission) is n ot t he f unctional e quivalent o f n o a rgument, b ut s omething m uch worse. In such circumstances, prejudice must be presumed. *See and compare United States v. Swanson,* 943 F.2d 1070, 1074-76 (9th Cir. 1991); *Francis v. Spraggins,* 720 F.2d 1190, 1193-95 (11th Cir. 1983), *cert. denied,* 470 U.S. 1059 (1985); *Wiley v. Sowders, supra,* 647 F.2d at 649-51; *with Childress v. Johnson,* 103 F.3d 1221, 1229 n.12 (5th Cir. 1997); *Scarpa v. Dubois,* 38 F.3d 1, 11-15 (1st Cir. 1994), *cert. denied,* 513 U.S. 1129 (1995).

In the case at bar, defense counsel succumbed to the feelings he expressed after the

verdict[8]; during his closing argument, he completely gave up the adversarial fight.

> "Cases get tried for many reasons, many reasons. Sometimes it's because the issues are of guilt or innocence. Sometimes there are other considerations." Tr. VI:149.

In these circumstances, the petitioner was denied her federal constitutional right under the

Fourteenth Amendment to the effective assistance of counsel and to a fair trial.

Respectfully submitted,
By his attorney,

Robert L. Shekctoff
BBO No. 457340
One McKinley Square
Boston, MA 02109
` (617) 367-3449

---

[8]*See* Tr. VII:33-34. "My attempt throughout the trial, in all honesty, was to minimize the damage that trying the case would cause."

8